# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
April 27, 2022
Lyle W. Cayce
Clerk

No. 21-20022

Charles Johnson,

*Plaintiff—Appellant*,

*versus*

TheHuffingtonpost.com, Incorporated,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
No. 4:20-CV-179

ON PETITION FOR REHEARING EN BANC

Before King, Smith, and Haynes, *Circuit Judges*.

Per Curiam:

Treating the petition for rehearing en banc as a petition for panel rehearing (5th Cir. R. 35 I.O.P.), the petition for panel rehearing is DENIED. The petition for rehearing en banc is DENIED because, at the request of one of its members, the court was polled, and a majority did not vote in favor of rehearing (Fed. R. App. P. 35 and 5th Cir. R. 35).

In the en banc poll, 7 judges voted in favor of rehearing (Judges Elrod, Haynes, Costa, Willett, Engelhardt, Oldham, and Wilson), and 10 voted

against rehearing (Chief Judge Richman and Judges Jones, Smith, Stewart, Dennis, Southwick, Graves, Higginson, Ho, and Duncan).

Jennifer Walker Elrod, *Circuit Judge*, joined by Haynes, Engelhardt, and Wilson, *Circuit Judges*, dissenting from the denial of *en banc* rehearing:

Does the Constitution immunize online news-media outlets from libel lawsuits in states in which they circulate their content online? The panel opinion in this case held that it does. I am not so sure. The Supreme Court has held that a print publication "aimed at a nationwide audience" is not immune from defamation actions in any state where it has "regular circulation." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 773–74, 781 (1984). Are *online* publications to be treated differently? We should have reheard this case *en banc* to reassess this question of exceptional importance.

We should also have reheard this case in light of the circuit split that the panel opinion begat. None of our sister circuits have "restricted application of *Keeton* to print publications" like the panel majority opinion does in this case. *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 330 (5th Cir. 2021) (Haynes, J., dissenting). In fact, decisions of the Seventh and Ninth Circuits have relied heavily on *Keeton* to uphold personal jurisdiction over companies whose Internet-driven business models evince intent to avail themselves of the privilege of doing business in the states in which they were sued. *See uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 427–30 (7th Cir. 2010); *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1229–31 (9th Cir. 2011). The Fourth Circuit recently held similarly. *See UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 352–55 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1057 (2021). The panel opinion in this case broke with these decisions, cabining *Keeton* to the almost-bygone world of print-only media.

I.

In January of 2019, the Huffington Post published a headline on its website that labeled plaintiff–appellant Charles ("Chuck") Johnson a

"Holocaust-Denying White Nationalist." Johnson sued HuffPost for libel. Characterizing the piece as a fake-news "hit job" by a "notoriously left-leaning" news outlet, Johnson adamantly repudiated the positions that HuffPost had publicly attributed to him and sought damages in excess of $1 million.

Johnson, a Texan, filed his complaint with the United States District Court for the Southern District of Texas. To establish the court's power to hear the case, Johnson alleged several interrelated contacts tying HuffPost—a Delaware corporation headquartered in New York—to Texas: HuffPost's online publication and its allegedly libelous article are freely available in Texas, where Johnson resides and where the article allegedly caused him reputational injury. The national media outlet "derives substantial revenue" in the course of "servicing the Texas market through [its] [w]ebsite." It "tracks the location and activities of Texas residents on [its] [w]ebsite thereby enabling targeted advertising to Texas residents that generate substantial revenue." And it has contracted "with advertisers in Texas to advertise on its [w]ebsite" and run ads on its site that are "geared to the Texas market."

HuffPost moved to dismiss for lack of personal jurisdiction, and the district court granted the motion. Our court's panel majority opinion affirmed, holding that none of these alleged contacts sufficed to empower a Texas federal court to hear this libel case against HuffPost. *Johnson*, 21 F.4th at 325. The opinion reasons that *Keeton* cannot be "woodenly appl[ied] . . . to [I]nternet publications" because "websites are different" than print publications. *Id.* Johnson sought rehearing of his case *en banc*, which, regrettably, today we deny.

## II.

"The analysis applicable to a case involving jurisdiction based on the Internet should not be different at its most basic level from any other personal jurisdiction case." *Admar Int'l, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, 786 (5th Cir. 2021) (quoting *Pervasive Software, Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 226–27 (5th Cir. 2012)). The panel majority opinion gives lip-service to this key principle, but it swiftly dismisses Johnson's reliance on *Keeton* simply because "websites are *different*." *Johnson*, 21 F.4th at 325 (emphasis added); *id.* at 330–31 (Haynes, J., dissenting). The panel opinion thus bifurcates the law of specific jurisdiction over defamation actions: we now have one rule for *print* publications and a new special rule for *web* publications. This approach plainly conflicts with our professed application of the same law to the Internet as to the material world.

### A.

This case turns on purposeful availment. The central question is this: what proves a publication's purposeful availment through cyberspace? In Johnson's view, HuffPost's online circulation of its content (including the disputed article), considered in light of its ad-driven business model, shows that the company intended to avail itself of the Texas market. The panel majority opinion says that Johnson must show something more: namely, that HuffPost specifically "aimed *the alleged libel* at Texas." *Id.* at 320–21 (majority opinion). As Judge Haynes meticulously explained in her panel dissent, we apply the Supreme Court's instructions in *Keeton* when a defamation defendant is a publication. *See id.* at 327–30 (Haynes, J., dissenting); *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 425 (5th Cir. 2005); *cf. Calder v. Jones*, 465 U.S. 783, 789–90 (1984) (*Keeton*'s companion case furnishing the "aiming" test for *author–editor* defendants).

In *Keeton v. Hustler*, the Supreme Court instructed us how to apply the purposeful availment requirement to defamation lawsuits against publications. *Keeton* held that a New Hampshire federal court had personal jurisdiction over Hustler, an Ohio-domiciled magazine with its principal place of business in California, to hear a libel lawsuit brought by a New Yorker.[1] 465 U.S. at 781. Hustler's *only* contact with New Hampshire was its circulation of 10,000–15,000 magazines (containing the alleged libel) in that state. *Id.* at 772. But that was sufficient for specific jurisdiction over Ms. Keeton's libel suit. It mattered not a whit that the alleged libel had *nothing* to do with New Hampshire besides the mere fact of its circulation there. *Id.* And why? Because circulation *itself* showed that Hustler "continuously and deliberately exploited the New Hampshire market" such that "it must reasonably anticipate being haled into court there in a libel action based on the contents of its magazine." *Id.* at 781 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98 (1980)). The bottom line is this: for a publishing company to purposefully avail itself of a state's marketplace, *Keeton* says its publication simply needs to be in "regular circulation" there. *Id.* at 773–74.

The Internet only presents a new twist for the old test: how do we *know* that a defendant publishing company continuously *and deliberately* exploited the forum state's market when its publication only 'circulates' by virtue of the Internet's universal accessibility? The panel majority opinion in this case holds that HuffPost's online circulation cannot constitute purposeful availment because Texans act *unilaterally* in visiting

[1] The Court noted that the New York plaintiff was flagrantly forum shopping: she had no particular connection with New Hampshire; she simply wanted to take advantage of that state's generous statute of limitations for libel. 465 U.S. at 772 n.1, 778–79. Here, by contrast, Johnson is a resident of the forum state, sensibly suing where he says he was injured.

huffpost.com. *Johnson*, 21 F.4th at 320–21. And as for HuffPost's geolocation tracking, Texan advertisers, and ads targeting Texans? "[I]rrelevant," says the panel majority opinion; "Johnson's libel claim arises from the story declaring him a white-nationalist Holocaust denier"—not HuffPost's sale of ads, the citizenship of its advertising counterparties, or the ads themselves. *Johnson*, 21 F.4th at 320–21.

That is all true. Third parties' unilateral activities do not create forum contacts for an unwitting defendant, *see Hanson v. Denckla*, 357 U.S. 235, 253–54 (1958), and a defendant's own forum contacts that are unrelated to the lawsuit itself are insufficient to support specific jurisdiction, *see Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021). The problem, though, is that the panel majority opinion's blinkered analysis did not put the puzzle pieces together. It did not consider HuffPost's online circulation *in light of* its ad-driven business model. As a result, it failed to tackle the harder and more consequential issue in this case. To wit: does HuffPost's ad-driven business model *prove* that HuffPost *intended* that its (ostensibly passive) online circulation would reach the Texas market?

The logic behind *Keeton* suggests that it very well might. HuffPost exploits the Texas market just as Hustler exploited the New Hampshire market. 465 U.S. at 781. The only difference is how they do so. Whereas Hustler sold magazines, HuffPost sells ads. By making its content freely available online, HuffPost lures visitors from far and wide. This creates value for advertisers, which HuffPost enhances by tracking visitors' geolocation data and enabling geotargeted ads. Hustler's circulation in New Hampshire was obviously no accident: it mailed print magazines there regularly. Likewise, the argument goes, HuffPost's Texan audience online was no accident: HuffPost put its content online with the expectation that it would attract viewers from the nation's second most populous state, whose views

would drive sales of targeted ads and thus boost HuffPost's revenue.[2] *See Johnson*, 21 F.4th at 331 (Haynes, J., dissenting) ("It is not an accident that Texans can access HuffPost, and the approach HuffPost takes towards Texas is the modern equivalent of Keeton sending magazines to New Hampshire."); *cf. Woodson*, 444 U.S. at 297–98 (authorizing personal jurisdiction when a corporation "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State"); *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2092 (2018) ("'[W]hile nexus rules are clearly necessary,' the Court 'should focus on rules that are appropriate to the twenty-first century, not the nineteenth.'") (citing Walter Hellerstein, *Deconstructing the Debate over State Taxation of Electronic Commerce*, 13 Harv. J.L. & Tech. 549, 553 (2000)).[3] If that is so, HuffPost's online circulation 'in' Texas provides the basis, under *Keeton*, for specific jurisdiction in Texas federal court.

B.

If Johnson were to succeed on this theory of purposeful availment, the rest of the specific-jurisdiction analysis would easily fall into place. Start with relatedness, the second prong of the analysis. HuffPost's online *circulation* in Texas is *itself* the relevant contact—not HuffPost's geolocation tracking, targeted ads, or contracts with Texan advertisers. And it is plain as day that

[2] HuffPost could put its content online *without* subjecting itself to jurisdiction in all fifty states if it wanted to. For instance, the publishing company could put its content behind a paywall and refuse to offer subscriptions to would-be visitors from certain undesired states. Or, it could simply refrain from showing ads to visitors from such states.

[3] *See also Wayfair*, 138 S. Ct. at 2099 (rejecting the antiquated "physical presence rule" in the dormant Commerce Clause context and holding that online retailers "avail[ed] [themselves] of the substantial privilege of carrying on business" in a state based in part on "both the economic and virtual contacts respondents have with the State" and on the fact that "respondents are large, national companies that undoubtedly maintain an extensive virtual presence" in the state (citations omitted)).

Johnson's libel claim arose out of HuffPost's circulation: Johnson's reputation was injured because HuffPost published allegedly false statements about him online.[4] *Cf. Keeton*, 465 U.S. at 772, 781. Indeed, as a Texas resident, Johnson was largely injured *in Texas*, where HuffPost purposefully circulated its allegedly libelous story and damaged his reputation most significantly: his own community. Clearly, online circulation gave rise to (or, at a bare minimum, "related to") Johnson's libel claim, just as Hustler's print circulation in New Hampshire gave rise to (or "related to") Ms. Keeton's libel claim. *See Ford Motor*, 141 S. Ct. at 1024–28 (reminding us that defendant's contacts need only "relate to" the plaintiff's claim).

Now consider the final prong of the analysis, fairness to the defendant. The panel majority opinion compares news-media giants like HuffPost to "[g]rannies with cooking blogs [who] do not, and should not, expect lawsuits from Maui to Maine." *Johnson*, 21 F.4th at 320. It is hard to take this comparison seriously. HuffPost is no tech-savvy octogenarian sharing apple-pie recipes online. *Id.* at 331 (Haynes, J., dissenting). The publishing company does not casually post its content just to share its interest in current events with fellow enthusiasts wherever they may happen to reside. On the purposeful availment theory described above, HuffPost is a robust commercial enterprise, covetous of Texan clicks to help drive ad sales and thus boost its bottom line. And having taken advantage of Texas's market, it is only fair that HuffPost accept the burden of jurisdiction in Texas courts. Put simply, if HuffPost gets the *quid*, it cannot escape the *quo*. *See Curtis Publ'g Co. v. Golino*, 383 F.2d 586, 593 (5th Cir. 1967) ("Having accepted the benefits of the market place, [a publishing company] cannot complain that

[4] Libel is written defamation, and defamation requires *publication* of a false statement. *See Bedford v. Spassoff*, 520 S.W.3d 901, 904, 906 n.2 (Tex. 2017).

one of the fruits of the harvest [is] a lawsuit [for libel]." (quoting *Curtis Publ'g Co. v. Birdsong*, 360 F.2d 344, 353 (5th Cir. 1966) (Rives, J., concurring))).[5]

III.

The panel opinion in this case takes us out on a limb. It parts ways with every sister circuit to have addressed the matter. For this reason too, we should have reheard this case.

For starters, no other circuit has limited *Keeton*'s application solely to print-media defendants. *See, e.g.*, *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 977, 981 (9th Cir. 2021) (applying *Keeton* to the volume of skincare product sales); *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 10–11 (1st Cir. 2018) (applying *Keeton* to uphold personal jurisdiction over a foreign company that "used its website to obtain U.S. customer contracts"); *see also Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 900, 906, 914–15 (10th Cir. 2017) (observing that "[s]ome circuit courts have applied the *Keeton* analysis in cases where the out-of-state defendant's *only* contacts with the forum state occurred over the internet . . . ." (emphasis added)). The panel opinion's constrictive reading of *Keeton* is thus at odds with our sister circuits' application of that case.

But that is not all. The Fourth, Seventh, and Ninth Circuits have each specifically concluded that online companies whose business models depend upon attracting a wide audience for ad-driven revenue purposefully avail themselves of the privilege of doing business virtually in states where their sites are widely accessed. The panel majority opinion splits with these three

[5] *See also Choice Healthcare v. Kaiser Found. Health Plan of Colo.*, 615 F.3d 364, 374 (5th Cir. 2010) ("Deriving revenue from such commercial activity is the quid pro quo for requiring the defendant to suffer a suit in the foreign forum.").

sister circuits in concluding that HuffPost did not purposefully avail itself of the privilege of doing business in Texas.

Consider the Seventh Circuit's analysis in *uBID v. GoDaddy*. 623 F.3d at 427–30. In that case, the court discerned purposeful availment from an out-of-state domain-registration site's "way of doing business" online. *Id.* Arizona-based GoDaddy had conducted a nationwide ad campaign, targeting no state in particular, but it was sued in Illinois. Relying on *Keeton*, the court held that GoDaddy had "deliberately and continuously exploited the Illinois market." *Id.* at 427–29 & n.1, 433. "[I]t is easy to infer," the court observed, that GoDaddy "intended to reach as large an audience as possible, including the 13 million potential customers in the nation's fifth most populous state." *Id.* at 428. It did not matter that Illinois residents "unilaterally initiated" transactions with GoDaddy online; GoDaddy obviously wanted their business and used the Internet to get it. *Id.* at 428–29. Since a "typical business" operating on the same scale in terms of Illinois revenue and customers—but without the Internet—"would *unquestionably* be subject to personal jurisdiction," the Seventh Circuit concluded that GoDaddy's "unusual [Internet-based] business model [should not] complicate an otherwise straightforward case for sufficient minimum contacts" under *Keeton*. *Id.* at 429 (emphasis added).

The Ninth Circuit too has clearly held that a website whose "economic value turns, in significant measure, on its appeal to [forum residents]" may be subject to personal jurisdiction in the forum state. *Mavrix*, 647 F.3d at 1227–31.[6] In *Mavrix*, an Ohio-based online publication

[6] *See also AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1211 (9th Cir. 2020) (reaffirming the core teaching of *Mavrix*, as relevant here, that when "[ad] targeting itself indicate[s] that [a defendant website] knew about the [forum's] user base which it then exploit[s] 'for commercial gain by selling space on its website for advertisements,'" the

was sued in California. Applying *Keeton*, the court noted that the defendant website, like Hustler, "sought and attracted [a] nationwide audience[]" and "cultivated [its] nationwide audience[] for commercial gain." *Id.* at 1230. The court reasoned that the breadth of the defendant online publication's audience was "integral" to its ad-based "business model." *Id.* It was no accident that Californians visited Mavrix's website: Mavrix, like Hustler, *wanted* viewers "in any state"—including a populous state like California. *Id.* It was a "predictable consequence" of the website's "business model[]." *Id.* Thus, following *Keeton*, the Ninth Circuit held that when "a website with national viewership and scope appeals to, and profits from, an audience in a particular state, the site's operators can be said to have 'expressly aimed' at that state." *Id.* at 1231. Hence, specific jurisdiction in California was proper.

Most recently, in the international context, the Fourth Circuit held that a foreign website operator purposefully availed himself of the privilege of conducting business in Virginia. *See Kurbanov*, 963 F.3d at 352–55. Noting that "[i]t is hardly unusual for websites to be free to use in today's Internet because many corporations 'make money selling advertising space,'" the court concluded that forum-residents' "acts of accessing the Websites" supported specific jurisdiction because the website operator "made a *calculated business choice* not to directly charge visitors in order to lure them to his Websites." *Id.* at 353 (emphasis added) (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 926–27 (2005)). Because the website operator "ultimately profits from visitors by selling directed advertising space and data collected to third-party brokers, [he] thus purposefully avail[s] himself of the privilege of conducting business within Virginia." *Id.*

---

website can be said to have purposefully availed itself of the forum (quoting *Mavrix*, 647 F.3d at 1230)), *cert. denied*, 142 S. Ct. 76 (2021).

IV.

The panel majority opinion expresses concern at the jurisdiction-expanding implications of applying *Keeton* to cyberspace. *Johnson*, 21 F.4th at 321, 324, 326. To be sure, the Internet has revolutionized countless industries—news-media chief among them—and it has all but dissolved states' borders in matters of commerce. The Internet allows corporations to continuously and deliberately exploit more states' markets more easily. No doubt, that may mean that corporations taking advantage of the Internet's vast reach may be haled into more states' courts. As Judge Haynes reminded us in her excellent dissent, it is not for us to worry whether this is good or bad as a policy matter. *Id.* at 331–32 (Haynes, J., dissenting). That is properly left to the states and their long-arm statutes. Our sole concern is what the Constitution—as interpreted by the Supreme Court—requires.

In refusing to apply *Keeton* and failing to apply the appropriate purposeful availment test correctly, the panel majority opinion gave short shrift to the Supreme Court's guidance and broke with our sister circuits. For these reasons, I respectfully dissent from our denial of Johnson's petition for rehearing *en banc*.